**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
CASE NO. 05-21014-CIV-SEITZ/MCALILEY

ROBERT BIONDOLILLO,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.
_______________________________________/

**ORDER (1) GRANTING JUDGMENT FOR DEFENDANT FOLLOWING BENCH TRIAL; (2) DENYING PLAINTIFF'S MOTION FOR SANCTIONS; AND (3) CLOSING CASE**

THIS CASE came before the Court for a bench trial beginning July 25, 2007 and ending August 9, 2007. At issue was whether a grand jury's May 7, 2002 indictment of Plaintiff Robert Biondolillo for two counts of mail fraud was based on a "righteous prosecution" – that is, whether there was probable cause to support Plaintiff's indictment or whether the Government's agent, FBI Special Agent Steffan Nass, lied and acted with malice to secure that indictment.

The essence of Plaintiff's claim is that, when Nass failed to prove that Plaintiff, a police officer, had been connected to a fraud scheme at a chiropractic clinic where Plaintiff was a patient, Nass became the subject of derisive comments and jokes among his colleagues at the FBI for his failure. Thereafter, when Nass received a tip that Plaintiff may have committed another type of fraud, Nass focused on nabbing "the one that got away," launching a rogue, secretive investigation of Plaintiff and fabricating probable cause by lying in 32 instances to the grand jury about material facts in order to secure the indictment against Plaintiff. Plaintiff also contends that Nass omitted material facts from his presentation to the grand jury that would have shown he should not have been indicted for fraud.

In its April 4, 2007 Order denying the Government's motion for summary judgment [DE-171], this Court advised that "at trial, Plaintiff will have to establish that Agent Nass lied as to material facts, and

that without these lies, there would have been no reasonable grounds for believing that Plaintiff was guilty of the charges brought." The Court advised the parties that it would not consider testimony produced during the criminal trial, as the relevant information was what was known at the time the case was presented to the grand jury in April and May 2002.

Based on all of the evidence presented at trial, the Court finds that probable cause existed to support the indictment against Plaintiff for mail fraud. Because the Court finds that sufficient probable cause existed to indict Plaintiff, it would not need to reach the question of malice. However, the Court finds no evidence of malice on the record before it, and shall only briefly address that issue below. Accordingly, the Court shall enter judgment in Defendant's favor. The findings of fact and conclusions of law underlying the judgment are set out below.

## I. FINDINGS OF FACT

### A. Pre-Indictment

1. Prior to assuming his current duty station in Illinois in April 2005, Special Agent Steffan Nass was assigned to the FBI's Public Corruption Squad in Miami, where he investigated public corruption cases in Broward County. Between 1996 and 2000, he was assigned to the Health Care Fraud Squad at the Miami Field Office.

2. In 1999, Nass investigated allegations that chiropractors Russell Posner, Dawn Swilling, and other associates at the Sunstate Doctors Center were committing health care fraud by submitting false and/or fraudulent claim forms to private insurance carriers (the "Sunstate Case"). Plaintiff, a former police officer with the Sunrise Police Department then employed as an officer at the Florida Department of Law Enforcement ("FDLE"), was a patient of the clinic. Following an investigation (which included the presence at the clinic of undercover agent Darryl Gallaway,[1] posing as a patient),

---

[1] At the time of the Sunstate undercover operation, Gallaway was an officer with the Coral Springs Police Department. Previously, he had been an officer with the Sunrise Police Department, under Plaintiff's

Posner, Swilling, and others were indicted and found guilty, either through a plea or at trial, of health care fraud. Plaintiff was cleared of any involvement in the Sunstate Case.

3. In approximately June 2001, Gallaway mentioned to Nass that Plaintiff may have filed a fraudulent worker's compensation claim and made fraudulent claims in a related civil lawsuit several years earlier.

4. The fraud alleged against Plaintiff stemmed from his alleged injury during a drug sting operation on January 23, 1994, when he was a Captain in the Sunrise Police Department's Vice, Intelligence, and Narcotics ("VIN") Unit. Plaintiff was the supervisor in charge of the operation that day.

5. The transaction was to take place at an area between the McDonald's restaurant (13656 W. Sunrise Boulevard, City of Sunrise, Florida) and Shell gas station (13605 West Sunrise Boulevard, City of Sunrise, Florida) at the Sawgrass Mills Outlet Mall. There was a grassy swale/median between the Shell station and the McDonald's parking areas.

6. On January 23, 1994, Plaintiff and Sunrise Police Detective Daniel Kobayashi were riding in the same vehicle prior to the drug transaction. Plaintiff and Kobayashi positioned themselves in the parking lot of the McDonald's prior to the drug transaction.

7. During the drug transaction, Gallaway was acting in an undercover capacity. At the time of the arrest, Gallaway simulated a suspect being arrested and laid on the ground.

8. Once Gallaway gave the take-down signal and Plaintiff gave the arrest signal, both Plaintiff and Kobayashi exited their vehicle. Kobayashi crossed the grassy area between the McDonald's and the Shell station and tackled and handcuffed one of the suspects. Plaintiff also crossed the grassy area to get to the location of the drug suspects.

9. Several days after the drug operation, Plaintiff filed a Narrative, dated January 31, 1994,

---

supervision. Gallaway and Nass became friends during the time they worked together on the Sunstate Case.

wherein he wrote:

> Upon exiting the vehicle, the undersigned ran through a strip of what appeared to be a grassy area containing plants and shrubs between the parking lot of McDonalds [*sic*] and the pavement section of the Shell gas station. This grassy area appeared to be level and flat. Upon running atop of this grassy area, the undersigned stepped into a gully full of water, which may have come from an adjacent sprinkler system. As a result, the undersigned was caused to drop his left foot into the gully almost losing balance, causing injury to my left calf and right knee. After regaining my balance, I continued to pursue the suspect. **During the pursuit, in an attempt to apprehend the suspect, I used my right shoulder in an effort to knock the suspect down**, while at the same time Det. Kobayashi tackled the suspect to the ground.
>
> Immediately after the tackle the undersigned experienced severe pain in my right shoulder, as well as numbness down my arm and into my hand.
>
> Once all was secured, Det. Gallaway drove me to Universal Hospital emergency room.

(Def.'s Trial Ex. 1 at 0016-0017) (emphasis added).

10. The day after the drug operation, on January 24, 1994, a worker's compensation form regarding Plaintiff's injury was completed by Plaintiff's supervisor at the Sunrise Police Department, Assistant Police Chief Jerry Blough. (Def.'s Trial Ex. 2 at 0036.) Under "Employee's Description of Accident," the form states: "Injury to left leg + rt kn + rt shoulder while attempting to arrest a subject during a narcotic transaction." (*Id.*) Plaintiff did not sign this form. (*Id.*)

11. Also, on January 24, 1994, Plaintiff sought treatment from Dr. Richard Kleiman, an orthopaedic physician. (Def.'s Trial Ex. 4 at 0067-0070.) Regarding the cause and effect of injury, Dr. Kleiman's notes state:

> First office visit for this 38-year old male in his usual state of health. Until yesterday he worked as a police captain. He was involved in a drug raid. He was at that time running after an assailant when there was apparently like a defect in the ground, almost like an incline or almost like a depression. When he fell into the depression he felt a jarring sensation in his leg. He has noted pain in the lateral aspect of the lower leg on the side of the knee. Also some pain in the right side of the lower portion of the neck area. **Also**

> **apparently at the point after he was running he ran into one of the other people who he was chasing, striking with his shoulder area. Since then he has noted pain over the lateral side of the shoulder as well as a numbness in his right upper arm. He had no history of any similar problem in the past.** He was seen in a local hospital. He had x-rays done of his neck and shoulder. He is still complaining of some pain in the right knee. Denies ever having had a similar problem in the past.

(*Id.* at 0067) (emphasis added).

12. The next day, on January 25, 1994, Plaintiff was referred for treatment by Dr. Bruce Zaret, a neurologist. (Def.'s Trial Ex. 5 at 0071-0076.) Regarding the cause and effect of injury, Dr. Zaret's notes state:

> The patient reports that he was in his usual state of health until Sunday, 1/23/94. The patient was involved in a narcotics arrest. He was running from one parking lot, ran down into a gully between the parking lot where he was and the one opposite where the drug transaction was taking place. He reports that the gully was partially filled with water. He reports stepping down into the gully and injuring the lateral fibular head area of the left leg. **He then chased a suspect and attempted to wrestle the suspect down. He put his head and shoulder down and struck the right deltoid shoulder area with full impact into the suspect.** He states that after the "adrenaline wore off", he noticed that his hand was tingling.
>
> He reports that in the last 48 hours that he has continued to notice a diffuse numb feeling in the hand which is most prominent over the base of the thumb and over the lateral forearm. He reports a little paresthetic feeling in the first, second, third, fourth fingers, probably spares the fifth digit. He reports reduced sensation over the right deltoid area. He complains of pain in the right shoulder with abduction. He complains of sharp pain in the neck area and into the arm when he coughs or sneezes. Overall, he feels the power in his hand is okay.
>
> . . .
>
> **There is no history of low back pain, disc herniation** and there is no history of polio.

(*Id.* at 0071) (emphasis added).

13. On April 14, 1994, Plaintiff received treatment from Dr. F. Gary Gieseke, another neurologist. (Def.'s Trial Ex. 6 at 0077-0079.) Regarding the cause and effect of injury, Dr. Gieseke's

notes state:

> This patient is a 38 year old male, Sunrise police captain, who was well until 1/23/94 when he was chasing a suspect and running through a grassy area and was unaware that there was a depression in the ground with water, and his left leg went into this, jarring his leg severely and **he stumbled but continued to proceed and tackled the suspect, landing on his right shoulder.** He was jarred very severely and at the time he stepped in the depression full of water, there was a severe jarring of the left leg with pain in the left leg area. **Besides the right shoulder discomfort, he had noted pain in the neck with discomfort in the right arm with numbness of the right arm, particularly the forearm and hand, and most severe in the index and thumb on the right.**

(*Id.* at 0077) (emphasis added).

14. Plaintiff continued to see Dr. Zaret through 1994 and into 1995. On December 20, 1994, Dr. Zaret gave Plaintiff movement restrictions which limited his pulling and pushing force to 25 pounds and gave him a permanent disability rating of 15% to the body as a whole based on a herniated disk. (Pl.'s Trial Ex. 7 at 00104-00105.) On March 7, 1995, Dr. Zaret stated that he "would not recommend that [Plaintiff] do extremely heavy pushing or pulling with his arms over 50 pounds." (*Id.* at 00106.)

15. In contrast to these medical histories and description of his medical condition, prior to January 23, 1994, Plaintiff had sought treatment from chiropractor Dawn Swilling. (Def.'s Trial Ex. 7 at 0080-0083.) Plaintiff saw Swilling for neck and shoulder pain as far back as September of <u>1992</u>. (Pl.'s Trial Ex. 43 at 00043-00045; Def.'s Trial Ex. 7 at 0080-0083.) Then, in June of 1993, Swilling's notes reflect that Plaintiff "complain[ed] of lumbar and posterior pelvic pain and stiffness," and her examination "revealed lumbar and posterior pelvic muscle spasm, tenderness, subluxation complex[2] . . . ." (Def.'s Trial Ex. 7 at 0083.) Swilling's notes further reflect that Plaintiff returned on July 6, 1993, complaining not only of lower back pain and stiffness, but also of "cervical pain and stiffness and occipital headaches." (*Id.*) Thereafter, Plaintiff saw Swilling almost every day from August 21 through September 8, 1993,

---

[2] Subluxation occurs when one or more of the bones in the spine (vertebrae) move out of position and create pressure on, or irritate, spinal nerves.

complaining of pain and muscle spasms in his right shoulder. (Pl.'s Trial Ex. 43 at 00062-00070.) For example, on September 3, 1993, Plaintiff saw Swilling, complaining of "neck pain and stiffness." (Def.'s Trial Ex. 7 at 0081.) Swilling's notes from that day show that Plaintiff "also complained of pain in the right shoulder. Examination of the patient revealed cervical and right shoulder muscle spasm, tenderness, subluxation complex. Trigger points were painful in the shoulder muscles, especially the right scapular muscles. Decreased cervical and right shoulder ranges of motion." (*Id.* at 0081.) The next day, September 4, 1993, Plaintiff again saw Swilling. (*Id.*) Swilling's notes reflect: "Patient is feeling a little better but continues to complain of cervical and right shoulder pain and stiffness. Examination of the patient revealed cervical and right shoulder muscle spasm, tenderness and subluxation complex." (*Id.*)

16. While receiving treatment from Swilling, Plaintiff also sought treatment on August 20, 1993, for right shoulder pain at the Cleveland Clinic from Dr. Stephen Southworth. (Def.'s Trial Ex. 8 at 0084-0091.) The Cleveland Clinic's "Patient's Medical History Questionnaire" indicates that Plaintiff "had the problem" for "2 days." (*Id.* at 0084.) On the list of current symptoms, there are checkmarks next to "[w]eakness or numbness of arms or legs[,]" "[h]eadaches more than once or twice a week[,]" and "neck pain or stiffness[.]" (*Id.* at 0086.) Dr. Southworth's treatment notes state:

> This very pleasant, right hand dominant 38-year-old male has had two days of right shoulder pain, right upper arm numbness, tingling into the fingers, and pain radiating into the neck. **It started after he was doing some unusually strenuous yard work.** . . . There is no pre-existent history like this. He does have a previous medical history of low back pain, nonsurgically treated.

(*Id.* at 0089) (emphasis added). The Cleveland Clinic Florida Radiology Report provides the results of Plaintiff's X-Ray: "Mild degenerative changes are present with narrowing of the C4-5 disc space and osteophyte formation. There is mild narrowing of the right neural foramina at C3-4, C4-5, and C5-6

secondary to hypertrophy of the joints of Luscka."[3] (*Id.* at 0091.)

17. On September 7, 1993, Plaintiff sought treatment for right shoulder pain and radiating tingling in his right arm from Dr. Lawrence Russomanno. (Def.'s Trial Ex. 9 at 0092-0095.) Posner (Swilling's colleague at the Sunstate Doctors Center) had referred Plaintiff to Dr. Russomanno. (Def.'s Trial Ex. 15 at 0264 [Russomanno May 7, 2002 Grand Jury Test. 6:16-18].) Before the grand jury on May 7, 2002, Dr. Russomanno testified that Plaintiff said his right shoulder pain "came on suddenly within the last three weeks and it was starting to travel to his neck and he was having numbness down his arm." (*Id.* at 0266 [8:7-13].) Dr. Russomanno also testified that Plaintiff complained of "tingling and numbness in his first two fingers." (*Id.* [8:14-18].) Such symptoms are indicative of a cervical disc and pinched nerve problem.

18. Two years after the arrest incident, on January 22, 1996, the plaintiff filed a civil lawsuit against the owners of the Shell station and McDonald's properties on which the drug sting operation took place. (Pl.'s Trial Ex. 14 at 00186-00189.) Plaintiff filed an Amended Complaint on September 19, 1996. (Def.'s Trial Ex. 11.) Plaintiff settled his claim against Shell for $40,000 prior to January 13, 1997.

19. On January 13, 1997, Plaintiff was deposed in his civil lawsuit against McDonald's. He testified that, when he arrived at the drug transaction site on January 23, 1994, he went into the McDonald's and had a hamburger. (Def.'s Trial Ex. 12 at 0132-0133; 0142-0143 [Pl.'s Jan. 13, 1997 Dep. 26:18-27:22; 36:36:21-37:3].) According to Plaintiff, "[i]t would have been impossible for the sting to be going on before [he] got there." (*Id.* at 0143 [37:9-10].) He also testified that "[i]f the bad guys got there before the police," the sting would have been called off. (*Id.* at 0144 [38:7-17].)

20. During his deposition, Plaintiff testified that his physical complaints and permanent

---

[3] Notably, in connection with his civil law suit against Shell and McDonald's, Plaintiff told the independent insurance adjuster that the MRI he underwent pursuant to Dr. Kleiman's orders showed "the C5-6 disc herniation," and that he had "never had a prior problem with the C5-C-6." (Def.'s Trial Ex. 21 at 0428.)

disability were caused by stepping into an 18 inch to 2 foot hole that was a "hidden hazard." He did not tackle anyone during the drug sting operation. (*Id.* at 0149-0150 [43:7-44:6].) The following colloquy occurred:

Q: Did you ever have any contact at all with any of the perpetrators, so to speak, or the bad guys?

A: At that time?

Q: At any time.

A: Contact as far as physical contact?

Q: Yes.

A: No.

Q: You never touched them? Never tackled them?

A: No.

(*Id.* at 0149-0150 [43:21-44:6].)

21. Plaintiff also testified at his January 1997 deposition that, because of his injury, "any and all of the sporting activities that [he] ever took part in are almost non-existent now or are non-existent now." (*Id.* at 0180 [74:3-6].) He stated that, prior to his injury, he had played basketball, "bowling to some degree," and racquetball. (*Id.* [74:7-11].) The following exchange occurred regarding whether or not Plaintiff would be able to attend the FBI National Academy ("FBINA"), which was important for his career advancement and for which he was a candidate:

Q: Anything stopping you from going now?

A: My injuries.

Q: How would they stop you?

A: At this point in time I don't believe Dr. Zaret or Kleiman would authorize the city to let me go based on my injuries.

Q: Why not?

A: Because I have a permanent disability rating and my injuries are permanent based on Dr. Zaret.

. . .

It's not just scholastics. **There's a lot of physical training involved in it as well.** I'm sorry. I just assumed you knew what it was.

Q: And you couldn't accomplish that at this time; is that what you're telling me?

A: That's what the doctors are telling me.

(*Id.* at 0187 [81:2-21]) (emphasis added). On April 30, 2002, Dr. Zaret testified before the grand jury that he had never had a conversation with Plaintiff about whether or not he could attend the FBINA. (Def.'s Trial Ex. 15 at 0252 [Zaret May 7, 2002 Grand Jury Test. 28:8-29:10].)

22. On September 4, 1996, two weeks before Plaintiff filed his Amended Complaint, Plaintiff completed a form entitled, "Application to Attend FBI National Academy Program," in order to attend the FBINA's 189th Session beginning April 6, 1997 (*Id.* at 0215.) In Section II of that form, Plaintiff was asked questions about his "Physical Status:"

(a) "Are you capable of performing sustained vigorous physical activity?" Plaintiff checked the box next to "Yes;"

(b) Do you have any physical defects which would preclude unrestricted, regular participation, during the National Academy Training Session, in firearms training, physical training and defensive tactics?" Plaintiff checked the box next to "No." (*Id.*)

In Section VI of the same form, Plaintiff was asked: "Are you personally the subject, or a party, of any investigation or pending litigation, civil or criminal?" Plaintiff checked the box next to "No." (*Id.* at 0216.) At trial, Plaintiff testified that this incorrect statement was caused by his secretary copying from his prior FBINA application.

23. Leading up to his attendance at the 1997 FBINA program, Plaintiff received certain

registration forms. On the page styled "Physical Training Unit," Plaintiff was asked the following question: "What physical activities have you engaged in during the past six months (type and frequency)?" (Def.'s Trial Ex. 13 at 0206.) Plaintiff's handwritten answer was: "Jogging Basketball Basic Exercises daily to weekly." (*Id.*) Further down on the same page, Plaintiff was asked: "Describe in detail any injuries or other physical disabilities incurred (sprains, operation, etc.) that would adversely affect your performance. Also list date and medical recommendations made by doctor." (*Id.*) Plaintiff left the answer space blank. (*Id.*)

24. On the required Report of Medical Examination for FBINA applicants, Dr. Steven W. Cohen indicated about Plaintiff on December 6, 1996:

(a) "Examinee ☐ is ☐ is not qualified for strenuous physical exertion." Dr. Cohen checked the box next to "is." (Pl.'s Trial Ex. 13 at 0211.)

(b) "Does examinee have any defects restricting or prohibiting his/her participation in defensive tactics and dangerous assignments which might entail the practical use of firearms?" Dr. Cohen checked the box next to "No." (*Id.*)

25. On December 12, 1996, after considering the documents Plaintiff had submitted to support that he was qualified to attend the FBINA, FBI employee Jean McCready prepared a memo to the Training Division noting that Plaintiff "meets all requirements for attendance in the National Academy Program and invitation may now be extended." (*Id.* at 0208.) McCready also stated on the form that Plaintiff "indicates he is on a routine physical fitness training program." (*Id.*)

26. On February 13, 1997, FBI Director Louis Freeh wrote a letter formally extending an invitation to Plaintiff to attend the FBINA. (Def.'s Trial Ex. 13 at 0199.) From April 6 to June 20, 1997, Plaintiff attended the FBINA. While there, on April 24, 1997, Plaintiff allegedly suffered an injury to his left ankle "while attending gym class" and "playing ball." (Def.'s Trial Ex. 14 at 0221-0222.)

**B. The Indictment**

On May 7, 2002, Plaintiff was indicted on two counts of mail fraud for obtaining money and other valuable property "by means of false and fraudulent pretenses and representations regarding the cause and effect and the circumstances surrounding the alleged injuries that defendant Biondolillo incurred during the arrest of the drug traffickers on January 23, 1994" (the "Indictment"). (Def.'s Trial Ex. 20 ¶ 10.) The below paragraphs recount the substantive allegations of the Indictment against Plaintiff and denote the accurate information upon which the grand jury had probable cause to return that Indictment.

27. Paragraph 11 of the Indictment alleges that the Supervisor's Accident/Injury Report, which Assistant Police Chief Jerry Blough filed on Plaintiff's behalf, "falsely stated that Plaintiff injured himself when he tackled a fleeing suspect and fell to the ground and injured himself."

- The Supervisor's Accident/Injury Report states: "A suspect fled during a narcotic transaction and was subsequently chased on foot and tackled. Employee feel [*sic*] to ground and injured himself." (Def.'s Trial Ex. 2 at 0037.) Although there is no sentence in the report that states, "Employee tackled the suspect," a reasonable person could interpret the two sentences as meaning that the employee was involved in the chase and tackle of the suspect and injured himself in connection therewith. As to the source of the information for the report, Nass testified before the grand jury that Blough "had no direct recollection as it was so long ago about who he received the information from, but he is certain that the information came directly from Mr. Biondolillo, as that is the likely source when filling those forms out."[4] (Def.'s Trial Ex. 15 at 0290 [Nass Apr. 30, 2002 Grand Jury Test. 16:15-22].) Other than Plaintiff's denials at trial that this information came from him, there is no other record evidence to support his

4 Nass's handwritten notes of his interview with Assistant Police Chief Blough do not differ materially from this testimony. In his handwritten notes, Nass wrote: "Believe it was Biond. that told . . . [illegible portion] but no certain." (Pl.'s Trial Ex. 35E at 02231.) Similarly, before the grand jury, Nass stated that Blough could not directly recall from where he got the information, but the likely source was the Plaintiff. (Def.'s Trial Ex. 15 at 0290 [16:15-22].)

contention. Moreover, the language of Blough's report is very similar to Plaintiff's own description of his alleged injuries which he wrote on January 31, 1994, and which the grand jury had as Exhibit 1.

28. Paragraph 12 of the Indictment alleges that Plaintiff "went to a doctor specializing in orthopedics in order to obtain workers' compensation benefits and told the doctor, among other things, that he was involved in a drug raid and was chasing after an assailant when he ran into one of the people he was chasing striking the person with his shoulder."

- This section of the Indictment is almost a direct quotation from Dr. Kleiman's report of his visit with Plaintiff. (Def.'s Trial Ex. 4 at 0067-0070.)

29. Paragraph 13 of the Indictment alleges that Plaintiff "saw a doctor specializing in neurology in order to obtain workers' compensation benefits and told the doctor, among other things, that he was chasing a suspect and attempted to wrestle the subject down when he put his head and shoulder down and struck his right shoulder area with full impact into the suspect."

- This section of the Indictment is almost a direct quotation from Dr. Zaret's report of his visit with Plaintiff. (Def.'s Trial Ex. 5 at 0071-0076.) It is further supported by Dr. Zaret's grand jury testimony.

30. Paragraph 14 of the Indictment alleges that Plaintiff "filed a police report claiming that he was running after a suspect in a drug transaction when, in an effort to apprehend the suspect, [he] used his right shoulder in an effort to knock the suspect down. Defendant Biondolillo's arrest report stated that after the tackle [he] experienced severe pain in his right shoulder, as well as numbness down his right arm and into his hand."

- This section of the Indictment is almost a direct quotation from Plaintiff's narrative report.[5] (Def.'s Trial Ex. 1 at 0016-0017.)

---

[5] At trial, Plaintiff attempted to explain away the statement in his narrative report that "[i]**mmediately after the tackle** the undersigned experienced severe pain in my right shoulder, as well as

31. Paragraph 15 alleges that Plaintiff told a second neurologist that "he was chasing a suspect and tackled the suspect landing on his right shoulder and that he was jarred very severely."

- This section of the Indictment is almost a direct quotation from Dr. Gieseke's report of his visit with Plaintiff.[6] (Def.'s Trial Ex. 6 at 0071-0079.)

32. Paragraph 16 of the Indictment alleges that Plaintiff "was paid a total of $9,990 by Johns Eastern for a 15% impairment mainly due to his fraudulent representation that he injured his neck and shoulder from the impact of tackling a suspect on January 23, 1994."

- There is no dispute that Plaintiff received $9,990 from Johns Eastern. The Court has previously discussed above the evidence supporting the reasonable conclusion that Plaintiff made statements to lead a reasonable person to conclude that he injured his neck and shoulder in connection with the tackle of a drug suspect on January 23, 1994.

33. Paragraph 17 of the Indictment alleges that "from in or about January 1994 to the present Johns Eastern has paid medical and pharmaceutical bills for [Plaintiff], and remains liable for future claims."

- This allegation was never in dispute.

34. Paragraph 18 of the Indictment alleges that Plaintiff "filed a lawsuit claiming that he should receive a money judgment from Lehn & S&S due to their negligence in maintaining the area

---

numbness down my arm and into my hand." (*Id.* at 0017) (emphasis added). Plaintiff testified that he had been referring to the tackle as merely a "point in time," and did not mean to suggest that he had been involved in the tackle in any way. This testimony was not credible, but rather, appeared to be a tortured effort to disavow his prior statement.

[6] At trial, Plaintiff tried to explain that Doctors Kleiman, Zaret, and Gieseke could not have received information about a tackle from him – that the information came from their sharing of the worker's compensation notice filed on Plaintiff's behalf. The Court did not find this explanation credible, as the three doctors' descriptions of Plaintiff's injury are sufficiently varied from each other to reflect each doctor's personal summary of events and medical history. It would have been wholly inconsistent with standard medical practice not to take a history from the patient himself, and there is no evidence in the record to suggest that any of the three doctors deviated from the norm. Most importantly, all three doctors' descriptions of how Plaintiff's injury occurred are consistent with Plaintiff's own description, as stated in his January 31, 1994 narrative report.

between their properties, which caused [him] to fall into a ditch filled with water and be injured."

- This allegation was never in dispute; Plaintiff filed his original Complaint against Shell and McDonald's on January 22, 1996. (Pl.'s Trial Ex. 14 at 00186-00189.)

35. Paragraph 19 of the Indictment alleges that "in or about December 1996, North American mailed a check in the amount of $40,000 to [Plaintiff's] attorney to settle his claim against S&S [Shell]."

- This allegation was never in dispute.

36. Paragraph 20 of the Indictment alleges that Plaintiff "was deposed by the attorney representing Lehn [McDonald's] and made numerous material misrepresentations and omissions, including the following:"

(a) Prior to his 1994 alleged injury, Plaintiff never experienced "numbness in his fingers and tingling in his arm, when in fact, five months prior to his injury, he had experienced these symptoms.

- At his 1997 deposition, Plaintiff described experiencing numbness in his forearm, tingling sensations in his fingers, and the skin on his shoulder and forearm being "cold to the touch." (Def.'s Trial Ex. 12 at 0177-0178 [71:12-72:15].) When asked whether or not he had ever had those problems before, Plaintiff answered, "Never." (*Id.* at 0178 [72:16-17].) However, Dr. Russomanno testified before the grand jury that Plaintiff gave him the following description in 1993 of the right shoulder pain: it "came on suddenly within the last three weeks and it was starting to travel to his neck and he was having numbness down his arm." (Def.'s Trial Ex. 15 at 0266 [8:7-13].) Dr. Russomanno also testified that Plaintiff had complained in 1993 of "tingling and numbness in his first two fingers." (*Id.* [8:14-18].)

(b) In 1993, Plaintiff had experienced shoulder and neck pain and only saw one doctor, when in fact, he had visited "the Cleveland Clinic experiencing arm numbness, tingling in his fingers, and pain radiating into his neck."

- Plaintiff testified at his 1997 deposition that he had only seen Dr. Russomanno for his

shoulder and neck pain. (Def.'s Trial Ex. 12 at 0118-0119 [12:25-13:17].) However, Plaintiff also sought treatment on August 20, 1993, for right shoulder pain at the Cleveland Clinic from Dr. Stephen Southworth. (Def.'s Trial Ex. 8 at 0084-0091.) The Cleveland Clinic's "Patient's Medical History Questionnaire" indicates that Plaintiff "had the problem" for "2 days." (*Id.* at 0084.) On the list of current symptoms, there are checkmarks next to "[w]eakness or numbness of arms or legs[,]" "[h]eadaches more than once or twice a week[,]" and "neck pain or stiffness[.]" (*Id.* at 0086.) Moreover, Plaintiff saw chiropractor Swilling for neck and shoulder pain as far back as September of <u>1992</u>. (Pl.'s Trial Ex. 43 at 00043-00045; Def.'s Trial Ex. 7 at 0080-0083.) In fact, as previously mentioned, Plaintiff saw Swilling almost every day from August 21 through September 8, 1993, complaining of pain and muscle spasms in his right shoulder. (Pl.'s Trial Ex. 43 at 00062-00070.)

(c) Plaintiff "claimed the neck and shoulder pain he incurred in 1993 had no specific cause, when in fact, it was caused by unusually strenuous yard work."

- Plaintiff testified at his 1997 deposition that he "did not recall an incident" leading to his neck and shoulder pain in 1993 – that he thought it was "spontaneous." (Def.'s Trial Ex. 12 at 0118-0119 [12:25-13:5].) However, he told Dr. Southworth of the Cleveland Clinic that the pain was from "unusually strenuous yard work." (Def.'s Trial Ex. 8 at 0089.)

(d) Plaintiff "had been treated by a chiropractor named Dawn Swilling only for minor lower back pain, when in fact, he had been treated for more than a year by Dawn Swilling for neck and shoulder pain."

- Plaintiff testified at his 1997 deposition that he "occasionally" saw a chiropractor for "some minor lower back pain." (Def.'s Trial Ex. 12 at 0120-0121 [14:8-15:7].) However, he did not tell McDonald's counsel that he had also seen Swilling for neck and shoulder pain as far back as September of <u>1992</u>. (Pl.'s Trial Ex. 43 at 00043-00045; Def.'s Trial Ex. 7 at 0080-0083.) In fact, just 5 months before his alleged injury on January 23, 1994, Plaintiff saw Swilling almost every day from August 21 through

September 8, 1993, complaining of pain and muscle spasms in his right shoulder. (Pl.'s Trial Ex. 43 at 00062-00070.) Plaintiff had had a personal as well as professional relationship with Swilling so it is difficult to conclude that he merely forgot to mention this fact.

(e) "[P]rior to the arrest of the drug trafficker, [Plaintiff] stopped to eat at the McDonalds [*sic*], when in fact, he had not eaten at the McDonalds [*sic*]."

- Plaintiff testified that he had gotten a hamburger for lunch at the McDonald's prior to the sting operation taking place. (Def.'s Trial Ex. 12 at 0132-0133, 0142-0145 [26:18-27:22; 36:21-39:20].) However, Kobayashi testified at trial consistently with what Nass told the grand jury – "that at no time did they [Kobayashi and Plaintiff] stop and eat at McDonalds [*sic*]." (Def.'s Trial Ex. 15 at 0360-0361 [Nass May 7, 2002 Grand Jury Test. 27:23-28:3].)

(f) Plaintiff "had never told the doctors who examined him after the alleged injury that he had tackled the subject, when in fact, he had told the doctors that he had tackled the subject;"

- In their reports, all three doctors describe a "tackle" or a "strike" with the right shoulder.[7] (*See* Def.'s Trial Exs. 4, 5, and 6.) The grand jury had all three reports in front of it during its deliberations, as well as Plaintiff's own January 31, 1994 description of the injury event..

(g) "[H]is doctors told him that the injury to his neck and shoulder was caused by his stepping into the hole, when in fact, the doctors told him the injury was caused by him allegedly tackling the subject;"

- Dr. Zaret testified before the grand jury:

Q: And with respect to it, you believed after the testing that you did that the mechanism of injury was this tackle; is that correct? That's what you reflected and passed on, I assume, did you have to pass that on to worker's comp?

---

[7] As previously mentioned, the Court did not find credible Plaintiff's insistence at trial that this information did not come from him. Plaintiff had made the same claim at his January 1997 deposition.

A: Of course, yes, the answer is yes on both.

Q: So you said that was the mechanism of injury was the tackle that he relayed to you?

A: The tackle for the shoulder and the arm.

Q: Right.

A. And the hole for the leg.

(Def.'s Trial Ex. 15 at 0244 [Zaret May 7, 2002 Grand Jury Test. 20:14-25].) Dr. Zaret explained that Plaintiff's alleged right shoulder injury could not have come from his fall/stumble in the gully, "unless [he] stepped in a hole and jarred [his] body with significant torque that [he] snapped [his] neck," (*Id.* at 0243-0244 [19:19-20:2].) Further, as Dr. Russomanno explained to the grand jury, tests run back in September 1993 revealed that Plaintiff had "clinical findings of a pinched nerve" in his neck, one of the causes of which "could have been that he had a disc problem." (Def.'s Trial Ex. 15 [Russomanno May 7, 2002 Grand Jury Test. at 0268 [10:8-17].) Dr. Russomanno told Plaintiff that "[t]he neck was the primary problem." (*Id.* at 0269 [11:8-17].)

(h) "[D]ue to his alleged injuries, he could no longer play certain sports, such as basketball and softball, when in fact, he could play such sports."

- Plaintiff testified in his 1997 deposition that, because of his injury, "any and all of the sporting activities that [he] ever took part in are almost non-existent now or are non-existent now." (Def.'s Trial Ex. 12 at 0180 [74:3-6].) However, on his registration forms for the FBINA, Plaintiff was asked the following question: "What physical activities have you engaged in during the past six months (type and frequency)?" (Def.'s Trial Ex. 13 at 0206.) Plaintiff's handwritten answer was: "Jogging Basketball Basic Exercises daily to weekly." (*Id.*)

(i) "[H]is doctors might not allow him to participate in an eleven week training session at the FBI National Academy, when in fact, in or about October 1996 [Plaintiff] had been told he was going

to the FBI National Academy and in or about December 1996 a physician had certified that [Plaintiff] could participate in strenuous physical activity . . . ."

- Plaintiff testified at his 1997 deposition that he did not believe Dr. Zaret or Dr. Kleiman would allow him to attend the FBINA based on his injuries. (Def.'s Trial Ex. 12 at 0187 [81:2-21].) When asked why not, Plaintiff stated: "Because I have a permanent disability rating and my injuries are permanent based on Dr. Zaret." (*Id.*) However, Dr. Zaret testified before the grand jury that he never had a conversation with Plaintiff about whether or not Plaintiff could attend the FBINA. (Def.'s Trial Ex. 15 at 0252 [28:8-29:10].) Further, Dr. Cohen certified Plaintiff for strenuous physical activity on December 6, 1996. (Def.'s Trial Ex. 13 at 0211.) Finally, the Court finds that, from his participation in the registration, interview, and medical examination process from October through December 1996, particularly as contrasted with his prior FBINA application experience, Plaintiff would have reasonably expected, in January 1997, to attend the FBINA's 189th session, despite not receiving his formal invitation until February 1997.

37. Paragraph 21 of the Indictment alleges that Plaintiff, "in conjunction with his enrollment at the FBI National Academy, filed a registration form wherein he stated that during the past six months he participated in jogging and basketball on a daily to weekly basis, and [Plaintiff] failed to enter anything in the section requesting him to detail any injuries or other physical disabilities incurred that would adversely affect his performance."

- This allegation comes directly from the FBINA registration form that Plaintiff had completed. (Def.'s Trial Ex. 13 at 0206.)

38. Paragraph 22 of the Indictment alleges "that from April 1, 1997 through June 30, 1997, [Plaintiff] attended the 189th session of the FBI National Academy, and participated in various strenuous physical activities, including defensive tactics, fitness runs and other forms of athletics."

- An injury report and a worker's compensation claim form were filed on Plaintiff's

behalf, regarding an injury he allegedly suffered "while attending gym class at the F.B.I. National Academy" and "playing ball." (Def.'s Trial Ex. 14 at 0221-0222.) Further, Plaintiff admitted at his 1997 deposition that FBINA attendees participated in various physical activities: "It's not just scholastics. **There's a lot of physical training involved in it as well.**" (Def.'s Trial Ex. 12 at 0187 [81:12-18].)

39. Paragraph 23 of the Indictment alleges "that in May 1997, the insurance company (Crum & Foster) representing Lehn issued a check for $10,000 to [Plaintiff] in order to settle the lawsuit against Lehn."

- This allegation was never in dispute.

## II. CONCLUSIONS OF LAW

A plaintiff must establish each of six elements for a successful malicious prosecution claim:

> (1) an original judicial proceeding against the present plaintiff was commenced or continued; (2) the present defendant was the legal cause of the original proceeding; (3) the termination of the original proceeding constituted a bona fide termination of that proceeding in favor of the present plaintiff; (4) there was an absence of probable cause for the original proceeding; (5) there was malice on the part of the present defendant; and (6) the plaintiff suffered damages as a result of the original proceeding.

*Kingsland v. City of Miami*, 382 F.3d 1220, 1234 (11th Cir. 2004). Because the criminal trial the United States instituted against Plaintiff ended in mistrial and the Government dismissed the indictment, this trial focused on the fourth and fifth elements – the alleged absence of probable cause and the alleged presence of malice. Because the Court finds that sufficient probable cause existed to indict Plaintiff, it would not need to reach the question of malice.[8] However, the Court shall briefly address malice in Section IIB below, finding that Plaintiff has not produced evidence to prevail on this element of his claim.

---

[8] Plaintiff testified that he was injured in his career development, lost overtime pay, experienced emotional distress and had to incur legal fees. Because Plaintiff has not prevailed on liability, it is not necessary to evaluate the damages issue.

A. **Probable Cause**

40. Probable cause is a "reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense with which he is charged." *Burns v. Gcc Beverages*, 502 So. 2d 1217, 1219 (Fla. 1986). Probable cause is "judged not with clinical detachment but with a common sense view to the realities of normal life." *Rankin v. Evans*, 133 F.3d 1425, 1436 (11th Cir. 1998) (internal citations omitted). A grand jury's return of an indictment creates a presumption of probable cause. *Kelly v. Serna*, 87 F.3d 1235, 1241 (11th Cir. 1996) ("A grand jury indictment constitutes *prima facie* evidence that probable cause existed for the prosecution"). In evaluating whether or not probable cause existed at the time of indictment, a court must consider whether the conduct or evidence was "objectively reasonable" based upon a "totality of the circumstances." *See Williams v. City of Homestead*, No. 06-11092, 2006 WL 3102305, at *1 (11th Cir. Nov. 2, 2006) (citation omitted).

41. The evidence presented at trial establishes that Nass investigated a suggestion from Gallaway that Plaintiff may have participated in a scheme to defraud worker's compensation and two corporate entities. As discussed above in Section I of this Order, the record demonstrates that the facts in the grand jury's possession would lead a reasonable person to believe, under the totality of the circumstances, that Plaintiff made material false statements to obtain personal benefits, and thus violated the federal mail fraud statute. The legal elements of mail fraud are:

> That Plaintiff knowingly devised or participated in a scheme to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises;
>
> That Plaintiff did so willfully with an intent to defraud;
>
> That Plaintiff used the United States Postal Service by mailing, or causing to be mailed, some matter or thing for the purpose of executing the scheme to defraud.

*See* 18 U.S.C. § 1341.

42. Certainly, an indictment procured with knowingly false testimony and/or intentional fabrication of evidence would not support a probable cause finding.[9] *Kelly*, 87 F.3d at 1241. Yet, the Court "need not entertain conclusory and unsubstantiated allegations of fabrication of evidence." *Kingsland*, 382 F.3d at 1227 n.8 (citing *Cunningham v. Gates*, 229 F.3d 1271, 1291-92 (9th Cir. 2000)). In his closing argument, Plaintiff's counsel retreated somewhat from the claim that Nass intentionally lied in his two appearances before the grand jury, namely on April 30, 2002 and May 7, 2002. Nevertheless, the Court analyzes below the previously alleged intentional misrepresentations to the grand jury.[10] A few inaccuracies and misstatements in the testimony do exist. However, Plaintiff had the burden to prove that Nass lied as to certain material facts and that, without those lies, there would have been no reasonable grounds for concluding that Plaintiff committed fraud. Plaintiff has not carried this burden. The Court has disregarded the portions of testimony containing misstatements and inaccuracies, and still finds that the remaining information before the grand jury (as discussed in Section I, above) was more than sufficient to establish probable cause for Plaintiff's May 7, 2002 indictment.

---

9 It is not sufficient for an investigation to be negligent; a plaintiff must show deliberate and malicious fraud on the grand jury to indict.

10 Shortly before trial, Plaintiff filed a trial memorandum which attached a chart containing 32 alleged misrepresentations that Nass made to the grand jury. (*See* DE-218 [Pl.'s Mem. of Law for Trial].) After Plaintiff fully presented his evidence at trial, the Court found as a matter of law and announced in open court on the record the reasons why Plaintiff had provided insufficient evidence to meet a *prima facie* case that 14 of the 32 statements were false. The parties then focused on the remaining 18 statements: numbers 2, 3, 4, 6, 7, a portion of 8, 11, 15, 16, 18, 20, a portion of 21, 25, 28, 29, a portion of 30, a portion of 31, and 32. In reviewing the evidence, these statements are either accurate (numbers 2, 3, 4, 11, 15, 18, 28, and 29) or are immaterial misstatements and speculation (numbers 6, 7, 8, 16, 20, 21, 25, 31, and 32). The Court discusses each of these statements in sequential order beginning with the accurate statements and then the immaterial misstatements and speculation during the April 30, 2002 grand jury session, followed by the May 7, 2002 session.

**April 30, 2002 Testimony (Def.'s Trial Ex. 15 at 0275-0333)**

*Accurate Statements*

a. Page 10, lines 7-24 (Numbers 2 and 3 on Plaintiff's chart):[11] "Mr. Biondolillo got out on the driver's side, first approached the undercover, playing up the fact that he was a bad guy, . . . [and] [a]fter speaking with the undercover, Mr. Biondolillo went across the grassy, the common grassy area into the Shell lot, where he proceeded to do the same thing to Sawyer who was taken down by Detective Cobyashi [*sic*] . . . ."

- Plaintiff does not dispute that he exited the driver's side of his vehicle. Further, Gallaway, whom this Court credits, testified consistently with what Nass told the grand jury. Gallaway admitted that he could not see the arrests of the other suspects, but stated that Plaintiff approached him "in role" when he was proned out on the ground and then proceeded toward the Shell station where the other suspects were located. Gallaway never saw Plaintiff tackle anyone. Even if Nass's statement to the grand jury did not track the exact route Plaintiff took from his car to the suspects' locations, the focus of the indictment was that Plaintiff, despite the representations in his January 31, 1994 statement and his representations to Drs. Kleiman, Zaret, and Gieseke which resulted in a 15% disability rating, was not involved in a "tackle" or "striking" of any of the suspects.

b. Page 11, lines 9-12 (Number 4 on Plaintiff's chart):[12] "Q: Taken to the ground and cuffed. And after he was taken to the ground and cuffed Biondolillo appears on the other side? A: That's correct."

- This is accurate. Kobayashi, whom this Court credits, testified consistently with what

[11] Plaintiff's trial memorandum had listed only page 10, lines 7 and 17. However, at trial, Plaintiff advised that he disputed the veracity of Nass's entire answer appearing at lines 7-24.

[12] Plaintiff's trial memorandum had listed only page 11, line 9. However, at trial, Plaintiff advised that he disputed the veracity of the question and answer combination appearing at lines 9-12.

Nass told the grand jury and wrote in his "302" report of his Kobayashi interview[13] – that Plaintiff appeared after Kobyashi had already taken the suspect, Sawyer, to the ground.

c. Page 16, lines 17-22 (Number 11 on Plaintiff's chart): "Yes, he had no direct recollection as it was so long ago about who he received the information from, but he is certain that the information came directly from Mr. Biondolillo, as that is the likely source when filling those forms out."

- The Court addressed this statement in paragraph 27 of this Order, above.

d. Page 35, line 14 through page 36, line 5 (Number 15 on Plaintiff's chart):[14]

A: He stopped going [to Dr. Swilling] for a time, and then back in August of 1993 he had a flare-up, which Dr. Swilling related was a very serious flair-up [*sic*] which resulted in severe pain in his neck, severe pain or sharp pain down his shoulder, and tingling in his hand, numbness in his hand that would cause him, as she said, to shake his hand because of the numbness. And she treated him for a period through August and September of 1993 for that.

Q: Okay. So you've spoken to her and she says that she recollects a year prior to the alleged injury Mr. Biondolillo coming in and having this problem with numbness in his hand, shaking his hand, and the problem with the pain going down from his shoulder into his arm?

A: That's correct.

- This is accurate. Plaintiff saw Swilling beginning in 1992 and almost every day between August 21 and September 8, 1993 for neck pain, right shoulder pain, and muscle spasms. (Pl.'s Trial Ex. 43 at 00043-00045, 00062-00070; Def.'s Trial Ex. 7 at 0080-0083.) Swilling testified at trial that she remembered that, during this time, Plaintiff had to shake his right hand from the numbness he was feeling, in order to get the blood flowing back into that hand, and she told Nass this information. The Court found Swilling credible. She came across as truthful: her answers were straight-forward, on point,

---

13 (Pl.'s Ex. 35J at 02429.)

14 Plaintiff's trial memorandum had listed only page 35, line 22 and then generally page 36. However, at trial, Plaintiff advised that he disputed the veracity of Nass's answer appearing at page 35, line 14 through page 36, line 5.

and consistent with the documentary evidence. Although she is a convicted felon, she has completed her term of imprisonment and supervised release, has been leading a law-abiding life, and had no interest in the outcome of this case.

e. Page 46, lines 24-25 and page 49, lines 19-25 (Number 18 on Plaintiff's chart):[15] Page 46: "So in September of '96 he had applied for and was accepted to go to the FBI National Academy." Page 49: "He knew he was going to go [to the FBINA] back in October of '96. That's when he arrived at the FBI and he was interviewed by an agent for his background, he's given his class date, he's given the class session, he's given some documents that he must prepare, such as a physical exam form and so forth that have to be completed and returned to the FBI."

- This is accurate. As previously discussed, the Court finds, based on the testimony at trial and the documentary evidence in the record, that, notwithstanding the point that the applicant was not officially "invited" until the formal letter from FBI Director Freeh arrived, there was an informal process (consisting of the completion of registration forms, participation in interviews, submission to medical examinations, and the receipt of a card with the dates upon which the applicant would be attending the program) by which the FBI would apprise FBINA applicants that, barring anything unusual, they would be attending the FBINA – before those applicants actually received their confirming invitation letter. It is also clear from Plaintiff's January 1997 deposition that Plaintiff understood this informal process when he testified that it was the alleged right shoulder injury that could prevent him from attending the FBINA in April 1997. If he did not have the understanding that he had been medically certified to attend the program, and would attend barring some unforeseen circumstance, then he had no basis to claim as a damage his inability to attend the program.

---

15 Plaintiff's trial memorandum had listed page 49, lines 19-20, but the Court has included the remainder of Nass's answer through line 25 for analysis.

*Immaterial Misstatements*

As previously mentioned, because there are some inaccuracies in these statements, the Court has disregarded them in its evaluation of whether or not probable cause existed to support Plaintiff's indictment. However, based on the totality of the circumstances, these misstatements are immaterial in light of the important facts discussed throughout the rest of this Order that overwhelmingly support a finding of probable cause.

f. Page 12, lines 6-11 (Number 6 on Plaintiff's chart):[16] "Yes. He said to the undercover and at least two of the detectives that were there that he had injured his neck and his shoulder, his neck and his right shoulder, and was having tingling down his right hand when he tackled the subject Sawyer and took him to the ground."[17]

- The statement as to the word "tackle" and "numbness and tingling" is not in the "302 " report of Nass's interview with Gallaway. That report states that Biondolillo complained to several officers that he "felt he had injured his shoulder during the arrest." (Pl.'s Trial Ex. 35H at 02272.) At trial, Gallaway testified that Plaintiff told him Plaintiff had tackled someone and injured his shoulder.

g. Page 12, lines 20-25 (Numbers 7 and 8 on Plaintiff's chart):[18] "As a matter of fact, one of the officers, the undercover, had an eyeball on Mr. Biondolillo from the time he got out of the car and was yelling at him until the time he went across the grassy area to, I guess, approach Mr. Sawyer, and at no time did he ever tackle anybody."

- Based on Gallaway's testimony at trial, it is inaccurate that Gallaway "had an eyeball

---

[16] Plaintiff's trial memorandum had listed only page 12, line 6. However, at trial, Plaintiff advised that he disputed the veracity of Nass's entire answer appearing at lines 6-11.

[17] The Court also allowed, from Nass's May 7, 2002 testimony, the related testimony at page 19, lines 4-5 (Number 30 on Plaintiff's chart): "He told Darryl Galloway [*sic*] that he had been injured while executing the tackle to take down one of the suspects."

[18] Plaintiff's trial memorandum had listed only page 12, line 20. However, at trial, Plaintiff advised that he disputed the veracity of Nass's entire answer appearing at lines 20-25.

on Mr. Biondolillo . . . ." Gallaway testified that he did not see Plaintiff tackle anyone.

h. Page 38, lines 7-10 (Number 16 on Plaintiff's chart):[19] "Q: And you're saying there was another prior hospitalization and that was what? A: The treatment at the Cleveland Clinic back in 1993."

- It is accurate that Plaintiff visited the Cleveland Clinic in August 1993 for right shoulder pain. Nass conceded at trial that he should have clarified that the Cleveland Clinic was not a hospital, but rather was a medical office building.

i. Page 51, lines 3-19 (Numbers 20 and 21 on Plaintiff's chart):

> I am fairly familiar with it as there were sessions of the National Academy going on back in 1986 [*sic*, should be 1996] when I attended the new agents training class, as well as we've spoken with the training coordinator at the Miami division as to what goes on at the National Academy.
>
> There's a number of things, including basic exercises, pushups, pull-ups, running, organized games such as softball, basketball.
>
> There's running that I recall very clearly where you run around with the medicine ball above the head, and defensive tactics such as arrest procedures, proning people out, placing cuffs, defensive tactics which include what the FBI was teaching at the time, the grassy[20] [*sic*] ground fighting techniques where one learns how to grapple on the ground with suspects.

- Whereas it appears that the FBINA session did not involve "running around with a medicine ball above the head" and some of the other physical activities described above, the thrust of the statement is that the Plaintiff needed to be certified for strenuous physical activity and the undisputed evidence is that (i) on his September 4, 1996 FBINA application, Plaintiff stated that he was "capable of performing sustained vigorous physical activity" and had no "physical defects which would preclude

---

[19] Plaintiff's trial memorandum had listed only page 38, line 7. However, at trial, Plaintiff advised that he disputed the veracity of the question and answer combination appearing at lines 7-10.

[20] This should have been transcribed as the "Gracie" ground fighting techniques.

unrestricted regular participation . . . during the National Academy Training Session, in firearms training, physical training and defensive tactics" (Def.'s Trial Ex. 13 at 0215); (ii) Dr. Cohen had certified Plaintiff for strenuous physical activity on December 6, 1996 (*Id.* at 0211); (iii) Plaintiff testified at his January 1997 deposition that the FBINA program was "not just scholastics. There's a lot of physical training involved in it as well" (Def.'s Ex. 12 at 0187 [81:15-18]); and (iv) the "Physical Fitness Assessment Report" in Plaintiff's July 1997 FDLE application reflected that he could bench press 198 pounds [Def.'s Trial Ex. 24 at 0442], despite his January 1997 testimony that his "permanent" injuries as found by Drs. Zaret and Kleiman could prevent him from attending the program (Dr. Zaret's restrictions of March 7, 1995 were no "extremely heavy lifting with his arms over 50 pounds" [Pl.'s Trial Ex. 7 at 0104-0106]).

**May 7, 2002 Testimony (Def.'s Trial Ex. 15 at 0334-0368)**

*Accurate Statements*

a. Page 13, lines 11-18 (Number 28 on Plaintiff's chart):[21]

A: Because obviously being a special agent with the Florida Department of Law Enforcement, as with any other law enforcement position, you have to be in fairly good physical health to be able to conduct investigations, make arrests, handle defensive tactics, firearms, and so forth.

Q: And did he mention anything about the fact that he had this problem with his neck –

A: No, none, not at all.

- It is accurate that one has to be in good physical health to be a law enforcement officer.

It is also accurate that Plaintiff did not disclose his right shoulder problems on his FDLE application. (Def.'s Trial Ex. 24 at 0442.) On the "Physical Fitness Assessment Report," under "Medical History Remarks," the statement "No problems expressed" appears. (*Id.*)

---

[21] Plaintiff's trial memorandum had listed only page 13, line 11. However, at trial, Plaintiff advised that he disputed the veracity of the question and answer combination appearing at lines 11 through 18.

b. Page 20, lines 13-14 (Number 29 on Plaintiff's chart):[22] "His [Assistant Police Chief Jerry Blough's] recollection was that he obtained that information directly from Mr. Biondolillo [pertaining to the information contained in Blough's Supervisor's Accident/Injury Report]."

- As discussed earlier in this Order, this is accurate. Nass's handwritten notes of his interview with Chief Blough do not differ materially from this testimony. In his handwritten notes, Nass wrote: "Believe it was Biond. that told . . . [illegible portion] but no certain." (Pl.'s Trial Ex. 35E at 02231.) Similarly, before the grand jury, Nass stated that Blough believed Plaintiff was the likely source of the information. (Def.'s Trial Ex. 15 at 0290 [16:15-22].)

*Immaterial Misstatement*

c. Page 6, line 25 through page 7 line 5 (Number 25 on Plaintiff's chart): "Q: Okay. And what did they [the Cleveland Clinic] determine his problem to be? A: They diagnosed him with mild degenerative changes in the C-4, C-5 region of the cervical spine and possible, I'm reading, mild tear, ripping of the right nueral [*sic*] section of C-3, C-4."

- The Cleveland Clinic Florida Radiology Report states: "Mild degenerative changes are present with narrowing of the C4-5 disc space and osteophyte formation. There is mild narrowing of the right neural foramina at C3-4, C4-5, and C5-6 secondary to hypertrophy of the joints of Luscka." (Def.'s Trial Ex. 8 at 0091.) The Court is satisfied that Nass either misstated or the court reporter mis-transcribed "tear, ripping" for "narrowing." Further, the grand jury transcript reflects that this report was not only a grand jury exhibit, but also that a copy of the report was handed out to each member of the grand jury.

*Immaterial Speculation*

d. Page 30, lines 18-22 (Number 31 on Plaintiff's chart):

Q: Okay. Now he also says in D that his present physical condition is

---

[22] Plaintiff's trial memorandum had listed only page 20, line 13. The Court has included Nass's entire answer through line 14.

fair?

A: Yes.

Q: Why would his present physical condition be fair?

A: As I understand he was somewhat overweight at that time.

• It is undisputed that Nass never met Plaintiff prior to his testimony before the grand jury. Nass testified at trial that he made the above statement in light of Dr. Cohen's December 6, 1996 report which stated that, "[u]nder proper medical supervision, employee should lose 5 pounds." (Def.'s Trial Ex. 13 at 0212.) Nass should not have engaged in this type of speculation before the grand jury, but as already noted, this statement is immaterial in light of the extensive record supporting a probable cause finding that Plaintiff made material misrepresentations which resulted in personal, financial benefits through the use of the mail.

e. Page 33, Lines 5-14 (Number 32 on Plaintiff's chart):

A: If he were to fail to see a physician for his condition in a twelve month period, if he wouldn't go to see the doctor within twelve months the file would be considered closed and he would not have any access to any future payments, lump sum payments[,] indemnity payments and so forth.

Q: Okay. So he keeps on going to doctors?

A: To keep the file open.

• Based on the evidence presented at trial, Nass also engaged in speculation here. The record evidence shows that Dr. Zaret required follow-up visits for Plaintiff every three, and later, every six months. Again, though, this speculative statement is immaterial in light of the whole record.

43. Plaintiff has also based his case on several facts that Nass omitted from the presentation to the grand jury, which Plaintiff claims would tend to show that he was not guilty of fraud. However, "[t]he government is under no duty to bring exculpatory evidence to the grand jury's attention."

*United States v. Waldon*, 363 F.3d 1103, 1109 (11th Cir. 2004) (citing *United States v. Williams*, 504 U.S. 36, 51-55 (1992)). Moreover, the alleged "omissions" do not change the legal conclusion that probable cause existed to return an indictment, based on what was in front of the grand jury.

Plaintiff focused primarily on Nass's failure to tell the grand jury that there were at least four witnesses who heard Plaintiff complain of an injury at the scene of the drug operation. Specifically, Plaintiff cites to the "302 " reports of the following witnesses: (1) Officer Carlos Ortiz, who had heard Plaintiff state: "'Did you see that, did you see that.' Biondolillo went on to claim that he had fallen while crossing the swale which separates the McDonald's Restaurant parking lot and the Shell Service Station parking lot" (Pl's Trial Ex. 35M); (2) Lt. Robert Voss, who "was informed that Captain Robert Biondolillo had suffered an injury during the execution of the arrests. Voss believes that Biondolillo claimed he suffered an injury to his shoulder after falling in a ditch . . ." (Pl.'s Trial Ex. 35O); and (3) Detectives Doug Williams and Edward Duffy, who had both seen Plaintiff looking disheveled, with stains on his pants, and that Plaintiff had complained of his shoulder hurting from falling in a ditch.[23] Even if Nass were under an obligation to present exculpatory evidence to the grand jury – and he was not – these pieces of evidence were not truly exculpatory. Not one of these officers saw Plaintiff fall in the gully, and the Indictment pertained to a tackle, not to a fall. Plaintiff may very well have stumbled in the gully, stained his clothes, and torn his pants. The mere fact that this may have happened is separate and apart from – and does not negate – Plaintiff's claim of a cervical/shoulder/nerve injury by way of a tackle to his worker's compensation doctors that he later testified never happened. It also does not negate his misrepresentations to worker's compensation doctors that he had no prior symptoms or his misrepresentations in his January 1997 deposition that his physical abilities had been limited when he had told FBINA officials just months before that he had no physical limitations.

---

[23] Plaintiff introduced at trial the video deposition testimony of these two witnesses.

**B. Malice**

44. The malice element of a malicious prosecution claim "may be either: (a) actual or subjective malice, sometimes called 'malice in fact,' which results in intentional wrong; or (b) 'legal malice,' which may be inferred from circumstances such as the want of probable cause, even though no actual malevolence or corrupt design is shown." *Morgan Int'l Realty v. Dade Underwriters Ins. Agency*, 617 So. 2d 455, 458 (Fla. 3d DCA 1993). Negligence is insufficient to support an inference of malice. *Ware v. United States*, 838 F. Supp. 1561, 1563 (M.D. Fla. 1993).

45. Here, the record evidence shows that Nass received Gallaway's tip in late June of 2001. He did a preliminary substantiation of the tip in July and August by interviewing two other officers at the scene, Kobayashi and Miceli; checked the court records in the civil law suit; and obtained Plaintiff's worker's compensation file. But for the events of September 11, 2001 and the anthrax investigation in Palm Beach County in September and October 2001, the meeting to authorize a formal investigation of Plaintiff would have occurred prior to November 1, 2001. At that meeting, then-AUSA Eileen O'Connor, FBI Special Agent in Charge ("SAC") Hector Pesquera, the ASACs for the white collar and organized crime sections, and a representative from FDLE all authorized the investigation of Plaintiff.

46. AUSA Jeffrey Kaplan ("AUSA Kaplan") was assigned to the case. Nass conferred with AUSA Kaplan during the development of the case and provided him with copies of all of his "302 " reports of witness interviews. Prior to presenting the case to the grand jury, AUSA Kaplan conducted interviews of those same witnesses, reviewed the relevant documents (including Plaintiff's medical records and 1997 deposition testimony), and found Nass's work to be professional. AUSA Kaplan testified that Nass did not pressure him to present Plaintiff's case to the grand jury. Rather, AUSA Kaplan was the one who presented the Government's evidence to the grand jury. If Nass were "out to get" Plaintiff, as Plaintiff believes, one would have to believe that all of the individuals mentioned in paragraphs 45 and 46 were in on the scheme, too. Based on the evidence presented, this proposition is not credible.

47. Throughout this trial, the only testimony regarding malice came from Plaintiff himself. As discussed below, the Court does not credit Plaintiff's testimony. As such, the Court finds no evidence of malice on the record before it.

## III. CREDIBILITY FINDING AS TO PLAINTIFF

48. The Court finds that Plaintiff was not a believable witness. The Court primarily relies on three pieces of evidence to support this finding (although this is, by no means, an exhaustive list of the instances during Plaintiff's trial testimony that would support such a finding, as indicated in other parts of this Order):

a. At trial, Plaintiff testified that Gallaway was biased against him because Plaintiff had disciplined Gallaway by sending him home from work without pay, in connection with an incident in approximately 1992 or 1995 when Gallaway arrived at work with his clothes on inside out. Plaintiff also testified that he was responsible for recommending Gallaway's subsequent demotion back to road patrol and associated reduction in pay. At trial, Gallaway denied that Plaintiff had demoted him for any reason. The testimony of Richard Fischer, the Assistant Personnel Director for the City of Sunrise, proved Plaintiff's testimony had no basis in fact. Fischer, who had never met Plaintiff and had not worked for the City of Sunrise during the time of Plaintiff's employment, brought with him to Court Gallaway's complete personnel file. Fischer's testimony, based on a review of Gallaway's file, established that, during his tenure with the Sunrise Police Department, Gallaway had ascended the ranks, earning periodic increases in salary. The file reflected no demotions and no reductions in pay, and would have so reflected had Gallaway suffered any demotions or reductions in pay.

b. Plaintiff testified at trial (and in his 1997 deposition) that, when he and Kobayashi arrived at the McDonald's, he went into the McDonald's, got a hamburger, then got back in the car and waited for the transaction to begin. This testimony directly contradicted with that of Kobayashi, whom this Court finds credible, as his testimony was straightforward and consistent with the documentary

evidence and there was no evidence of his interest in the outcome of the case. Kobayashi testified that he never saw Plaintiff buy a hamburger at McDonald's before the drug sting operation. In fact, according to Kobayashi, Plaintiff would not have had time to do this, since they arrived at the transaction site after the drug suspects. Plaintiff's tendency to make up facts that he apparently believes are helpful to him undermines his credibility.

c. At trial, Plaintiff testified that, when he stumbled in the gully between the Shell and McDonald's, he broke his fall with both of his hands and his right shoulder hit the ground, as well. This is the first time such an account of Plaintiff's alleged fall has surfaced. In fact, during Plaintiff's 1997 deposition in connection with his law suit against Shell and McDonald's, Plaintiff testified:

> A: When I ran through, I ran through stepping in with my left leg. When I stepped in with my left leg, the ground wasn't there and I dropped about 18 inches to two feet realizing at that point in time that it was full of water and I couldn't see the water because the top of the water was covered with debris and leaves and branches and what have you.
>
> When I dropped down into the hole, I received severe pain in my left leg and I jolted. My whole body jolted. My knee buckled and I started to fall down.
>
> While I was in the process of falling down, I brought my right leg in and stepped into the hole, but a little higher up on the Shell side where I didn't drop completely down into that gully, so to speak. I was able to regain my balance and continue running.
>
> Q: So, it's your left leg that you felt an immediate problem with?
>
> A: Correct.
>
> Q: Any other places of your body you felt an immediate problem with?
>
> A: I had some tingling in my hand.
>
> Q: Which hand?
>
> A: My right hand?
>
> **Q: Did you strike anything with your right hand?**

**A: No.**

(Def.'s Trial Ex. 12 at 0148-0149 [42:1-43:4]) (emphasis added). Plaintiff also did not mention breaking his fall with both hands or hitting his right shoulder on the ground in the report he filed on January 31, 1994; this report described that his left foot dropped into the gully, "almost losing balance, causing injury to my left calf and right knee." (Def.'s Trial Ex. 1 at 0016-0017.) Plaintiff's testimony about breaking his fall with his hands appears to be a further metamorphosis of the mechanism of his injury. Plaintiff's first position was for worker's compensation purposes: he injured his right shoulder by way of a tackle/strike. Plaintiff's second position was for premises liability purposes: he injured his right shoulder when he stepped into the 18-inch to 2-foot hole, which was a "hidden hazard" to him and caused a severe jolt to his body.[24] Finally, at trial, Plaintiff's third position was for all purposes: he injured his right shoulder when he broke his fall with both of his hands and his shoulder hit the ground, and he injured his leg by jarring it

---

[24] On May 3, 1995, Plaintiff told the independent insurance adjuster, Gene Paul:

> Once the transaction was consummated we moved from the ah, from that particular area at McDonalds [*sic*] in a direction closer to the Shell Station, at which time I exited the vehicle and ah, once the, again, you know, once the deal was consummated, ah, all the officers involved were notified and advised to move in to make the apprehension. At that point in time, I exited the vehicle and ran through what looked like a , a, grassy area – it had shrubbery in it that looked flat and level when I ran through it. I found it to be a gully and I dropped down, my left foot dropped down into a gully that was full of water. I immediately sustained pain in my ah, in my left leg.

(Def.'s Trial Ex. 21 at 0425.) Plaintiff went on to state:

> Um, in this strip of grassy area there are cut-outs between shrubbery, which is one of the passageways I went through. I continued on through that and at the time, ah, one suspect was attempting to flee. I continued after that particular suspect and as I neared that suspect, I lowered my right shoulder in an effort to ah, to bump him, to knock him to the ground and just before I could do that, Detective Dan Kobayachi [*sic*], who was a, a rather strong individual, ah, was able to clothesline tackle the individual before I could. **I had minimal, if any, contact with my shoulder with the suspect, and ah, Dan just ah, clotheslined him and took him to the ground.**

(*Id.*) (emphasis added).

when he fell in the gully. This story would cover his entitlement to worker's compensation because he aggravated a pre-existing condition on the job, would justify his civil lawsuit against Shell and McDonald's for premises liability, and would provide an explanation for why his claims could not be misrepresentations. The difficulty with this evolution is that Plaintiff's story shifts depending on the audience and perceived benefits, and contrasts starkly with his representations to the FBINA that, at this same time, he had no physical impairments or limitations. Such inconsistencies prevent crediting Plaintiff's trial testimony.

## IV. CONCLUSION

The Court finds that the grand jury had probable cause to support its May 7, 2002 indictment of Plaintiff for two counts of mail fraud. The Court further finds that Special Agent Steffan Nass did not act with malice in trying to secure the indictment. Based on the foregoing, it is hereby

ORDERED that:

(1) Judgment shall be ENTERED in favor of Defendant, United States of America, on Plaintiff's claim for malicious prosecution;

(2) Plaintiff's Motion for Sanctions for Discovery Violations [DE-224] is DENIED, as the violations have not caused unfair prejudice to Plaintiff;

(3) All other pending motions not otherwise ruled upon in this Order are DENIED AS MOOT; and

(3) This case is CLOSED.

DONE AND ORDERED in Miami, Florida, this 24th day of August, 2007.

PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

cc: All Counsel of Record